323-0357, the people of the state of Illinois, Appalachia v. Robert A. Watson, Appellant. Mr. Golfis, you may proceed. Thank you, Your Honor, and good afternoon. For the record, I'm Demetri Golfis. I'm from the Office of the State Appellant Defender, and I represent Robert Watson. May it please the Court and Ms. Bella. Your Honors, Robert Watson was found guilty but mentally ill of first-degree murder after a jury trial. We've raised three issues on appeal. Although all the issues are important, and I'm happy to answer whatever questions the Court has regarding any of them, I'll be focusing my argument today on the second question presented. And that question is whether the trial court violated the attorney-client and the work product privileges by allowing the state to have access to the sanity report prepared by Dr. Anna Stapleton, who is a consulting, non-testifying defense expert, and then fervor violated those privileges by allowing the state to call Dr. Stapleton as a prosecution expert at trial. Mr. Watson is asking that this Court hold that the trial court violated both of these privileges in this case and that you reverse his conviction and remand for further proceedings. Your Honors, when the trial court granted the state's pretrial request for access to Dr. Stapleton, the court repeatedly said, I don't like this, signaling that it was not comfortable with the decision it had made. There was good reason for this. When the Court issued its ruling, it said it was relying on Article 104 of the Code of Criminal Procedure. That article did not apply to the issue before the Court regarding discovery of a sanity expert's evaluation. That Article 104 addresses fitness proceedings. The rule that did apply was Supreme Court Rule 413C. And what that rule says is that the state may access an expert's report that's in defense counsel's possession, except for portions of reports that contain statements of a defendant when defense counsel does not intend to use that report at trial. Now, importantly, there are two exceptions to this general rule. The first exception is contained in the language of Rule 413C itself. It says that the rule is subject to constitutional limitations. In criminal cases, the attorney-client privilege is a rule of constitutional limitation because the Sixth Amendment right to counsel encompasses attorney-client privacy. The second exception to Rule 413C is contained in Supreme Court Rule 412J, Romanette 1, and that is the worked product privilege. And what that rule says is that disclosure under Rule 413 shall not be required of reports to the extent that they contain opinions, theories, or conclusions of defense counsel staff. Now, Your Honors, the decisions of both the Appellate Court and our Supreme Court in the case of Peeples v. Knuckles, which is a case that Mr. Watson relied on in a trial court, both those courts addressed the application of both the attorney-client and the worked product privilege to situations where a prosecution wants access to a defense insanity expert. Knuckles is directly on point, and it dictates that both of the privileges apply in Mr. Watson's case. Can I ask a question regarding Knuckles?  In Knuckles, the defendant cooperated with Dr. Rossiter, the psychologist or psychiatrist, and submitted to an interview. In this particular case, as I understand the facts, the defendant never cooperated or spoke to anybody, and none of the documents, items, videos, whatever it was that the doctor relied upon were privileged. They were all, because of the fitness hearing, in the basket, if you will, of both the state and the defense. Does that not distinguish Knuckles in a way that might be significant? That would distinguish Knuckles, except your understanding of the record is inaccurate. The record establishes that there was a sanity interview of Mr. Watson by Dr. Stapleton. The prosecutor told the court that there was an interview. Dr. Stapleton testified that during this interview, Mr. Watson gave responses to some of her questions, although he did not cooperate to the extent that she wanted. Now, Dr. Stapleton's sanity report is also now part of a record, and if you look at that report, particularly page 3 and 17, she actually documents her conversation with Mr. Watson, and she quotes statements that he made to her. Is your understanding that those conversations occurred as part of the sanity evaluation and not the fitness evaluation? Correct. They occurred, and I can even give you a date, on October 22, 2022. Let me second pinpoint the date of the fitness evaluations. The fitness evaluations would have been in 2019, and then again in 2022, the summer of 2022. Was this brought to Judge Carlson's attention at the hearing? At the hearing, the prosecutor told the court that there was a sanity interview. Correct. They didn't get into the extent of what was said. However, later on at trial, Dr. Stapleton testified that there were statements that the defendant made to her that he gave responses to her questions. So, I mean, I think the record as it stands right now establishes that there were confidential privileged communications that were had for purposes of a sanity evaluation, and that the court ordered those to be disclosed to the prosecution. And I would just make one further point, that when you look at the content of her report, she's not just documenting conversations and statements of Mr. Watson. She actually goes so far as to draw conclusions based on things he said to her and what she observed. And just to give an example, at one point she says that Mr. Watson asked her, Do you see the figure in my peripheral? Do you see the person in my peripheral? And she writes that that statement was contrary to Mr. Watson's presentation. She said that Mr. Watson was presenting as, and I can have a report in front of me, I can quote, without perceptual disturbance. So what she's saying is that Mr. Watson is essentially telling her, I'm having a hallucination right now during the sanity interview, and she's saying I'm observing him and he's not presenting as if he is having a hallucination. So essentially, this sanity interview is allowing her to conclude that he's malingering, which just corroborates her finding that he's a malingerer, which she ultimately told the jury at trial. So she is actually reaching conclusions based on the sanity interview that she had with them. I know she told the attorneys at the time of this motion hearing that there weren't any attorney-client communications that played a role in her evaluation, but that's just not true. I mean, her report demonstrates that they did. And when you look at the Knuckles case, the rule that the Supreme Court announced in Knuckles is, if there are confidential communications between a defensive sanity expert and a defendant for purposes of a sanity evaluation, then no statements are privileged unless an exception applies. It's a bright-line rule. And what the court said was that the opinion of a sanity expert will, quote, almost invariably result from confidential communications with the defendant. So this isn't a situation. What the court is saying is that sanity experts are a special case. They're not like the handwriting experts or fingerprint experts. When a defendant says things to a sanity expert, whatever conclusion the expert comes to, the expert is essentially necessarily relying on what the defendant tells them. So that's the reason for a bright-line rule. And we know that that prong of a rule is satisfied here because we know that there were confidential communications. The only remaining question is whether either of those two exceptions that the Knuckles court talked about are present in this case. And they're not. The defense was very clear with the court that they were not going to be calling Dr. Stableton as a defense expert at trial. And we also know from the record that Dr. Argumento, who ultimately was the defense expert at trial, we know she didn't rely on Dr. Stableton's report or her opinions because Dr. Argumento's sanity report is part of her record as well, and it doesn't reference Dr. Stableton at all. So for those reasons, the attorney-client privilege applied, and it was violated by the trial court when it ordered disclosure of a report and allowed Dr. Stableton to testify as a prosecution expert. I would just note that because this is happening over the phone, I don't know where I'm at in purposes of the time limitations. So whatever the court wants to stop me, it certainly can. I will go on and briefly address the work product privilege. It's undisputed that Dr. Stableton was retained as a defense expert. Therefore, when she completed her evaluation of Mr. Watson, when she interviewed him, authored a report, she did so as an agent of defense counsel, as a member of defense counsel staff. So all of her opinions and conclusions and theories, whether they came in the form of a report or they came in the form of testimony at trial, all of that was covered by the work product privilege, and it was off limits to the state. Briefly, just to comment on prejudice, I would emphasize that Dr. Stableton's testimony was the most important evidence that the state presented at trial. In this case, the defense did not dispute that Mr. Watson killed the victim. The only disputed issue at trial was Mr. Watson's mental condition and whatever he was saying at the time of the offense. And if you exclude Dr. Stableton's testimony from a trial, then you have no prosecution expert testifying that Mr. Watson was saying. You have no prosecution expert rebutting Dr. Argumento's testimony, and you have no prosecution expert who is essentially narrating the surveillance video from Harris Casino, giving her opinion that Mr. Watson appeared to be of sound mind, making cautious decisions, and taking active steps to avoid apprehension. So the violations of privilege in this case were not harmless error, and for these reasons, Mr. Watson asks that you reverse his conviction and remand for further proceedings. And if the court has any further questions, I'd be happy to answer them. Justice Albrecht or Justice Peterson? I just want to make sure that – can you tell me where in the record it shows Dr. Stapleton actually did an evaluation? For the insanity defense? Are you saying a written evaluation or an interview or both? Well, what the record seems to reflect is that the – without me looking at it more closely, is that the – for the insanity, not for the written evaluation, because we know she didn't do a written evaluation. She said – or the argument of the state is that everything she used came from the fitness evaluation. Sure. Okay, I can point to some places in the record for you to take a look at. So if you look at page 743 of the report of proceedings, the prosecutor tells the court at the top of the page that there was an interview. And then if you look at page 1646 of the report of proceedings, Dr. Stapleton tells the court, quote, he was able to provide me a few responses when I met with him, but it was very limited and he wouldn't – he wasn't open to discussing what we needed to discuss to go through the components of the evaluation. So she's saying that he did respond to her during this interview. And then I would also note that after the briefs were submitted in this case, and at the time that I had filed the reply brief, we had filed a motion to supplement the record with the – with Dr. Stapleton's written sanity report. And the court granted that motion, so it is part of a record. So her written sanity report is a supplemental record that is before the court. Thank you. And if you look at – okay. Anything, Justice Peterson? No, I have no other questions. All right. And then, Mr. Golfus, in that written sanity report that the record was supplemented with, you're indicating that there as well, the doctor indicates she spoke with a defendant. Yes. On page three, it documents her conversation with Mr. Watson on October 22nd, 2022, and she's quoting the things that she says to him, and she's reaching conclusions based on things that she – that he tells her. The malingering that you referenced earlier. Yes. I mean, my argument is that based on the things that he tells her during this sanity interview and her – what she observes of him, she is – she doesn't use the word malingering, but that is essentially what she's saying when she's saying that, and I can quote, he did not appear in a manner of suggesting confusion, disorientation, or perceptual disturbance. Contrary to his presentation, Mr. Watson poignantly interrupted the questions posed by this evaluator to repeatedly state he can't discuss the case, and then asked this evaluator, do you see the person in my peripheral? So when she's saying that statement, do you see this thing in my peripheral, is contrary to his presentation, which she believes to be without perceptual disturbance, she's saying that, you know, when he's telling her, do you see the person in my peripheral, he's essentially saying he's having a hallucination, but when I observe him, he's not physically acting as if he's having a hallucination. And if that's the way she's interpreting things, then she's saying he's making it up, he's malingering, and that would just support the ultimate conclusion that she gave at trial, that he was a malinger. Thank you. You'll have an opportunity again in rebuttal. Ms. Bella. Good afternoon, your honors. May it please the court. I'm Jamie Bella, and I'm here on behalf of the people of the state of Illinois. I do want to address some of the issues raised in issue number one, but I had a little bit of a difficult time hearing counsel's arguments, so I wanted to just address some of the things that I did hear that relate to the second issue regarding the report. I would say, as far as the report itself goes, there is a copy of it, and I did not have a copy of the report until after my brief was filed. But in the reply brief, the defendant argues that the record establishes that this interview contained privileged information, and that the information was relied on in informing her sanity opinion. So as far as the record itself without the report goes, it refers to the prosecutor's comment that there was an interview and that Dr. Stapleton made observations, and that there was a lack of cooperation by the defendant. Dr. Stapleton's testimony also that she interviewed the defendant and that the defendant provided some responses but was not fully cooperative, because he was not willing to discuss what she needed him to discuss in order to complete her evaluation. And then Dr. Stapleton testified that she reached her sanity based on all the evidence and observations that she made of him. But when the report was filed as a supplement after, and including the comments, I think he said page three and page 17, where Dr. Stapleton discusses some of the things that went on during her interview, her last interview for the sanity evaluation in October of 22. But if you look closely at the report and you look closely at her findings, her ultimate conclusions with respect to sanity. On page 28, she says regarding this evaluator's clinical opinion of whether Mr. Watson lacks substantial capacity to appreciate the criminality of his conduct due to mental disease or defect. She said plainly the data supporting her opinion was based on her clinical impressions derived from reviewing his presentation, behavior, and mannerisms within the day and hours leading up to the index offense. Let me just interrupt. Are we really going to parse out attorney-client privilege? On this type of a, you know, close situation. In other words, here's my real, here's my question. Knuckles is clear. If you have a situation where the defense expert speaks to the defendant and reaches an opinion, and then the state is not, sorry, the defense is not going to call that expert. And whatever expert they are calling didn't utilize any aspect of the first expert's report. In that situation, attorney-client privilege applies vis-a-vis that expert. I don't think, hold on, let me finish. I don't read Knuckles as saying we should further look into the actual nature and extent of the discussion and see whether it was or wasn't relevant. I mean, that seems to kind of defeat the whole point of attorney-client privilege in the first place. I think that the distinction with this case, I think, is where there was four, prior to the sanity, there was four separate evaluations conducted with respect to fitness. And under Rule 413, all of the communications and all of the information derived from those are not protected under privilege. In trying to perform a sanity evaluation, Dr. Stapleton was very clear in the last hearing, I don't have the date in front of me, prior to trial, where they discussed this issue, defense counsel was not able to get an opinion regarding sanity. The way that, in Dr. Stapleton's report, she specifically says that, and she details, it's a 32-page report. She details, moment by moment, the evidence that she reviewed, which was the recordings, a lot of it was the video recordings from the casino itself, as well as all of the other, the police reports, the witness reports. And then she looks at video that was recovered from the library, which, where he was arrested the day after the casino. Is it a simpler rule that the state doesn't get to use a defense expert who has interviewed the defendant in a mental health situation for sanity, if the defense has already utilized that expert, obtained an opinion, and is choosing not to call that expert? That's a defense expert, this isn't a civil case, it's a criminal case, and when I read Knuckles, that seems to be a much simpler conclusion after Knuckles than, we're going to parse out the actual basis of the doctor's opinion in her report. And maybe, even though she talked to the defendant, which is privileged, maybe she didn't actually consider it, so it's okay. That seems very dangerous to me. Well, I think that the distinction, and where Staples, or I'm sorry, Knuckles is different from this case, from Lawson, is that in Staples, I keep saying, in Knuckles, the doctor did not conduct a fitness evaluation. So, Rule 413 specifically allows Dr. Stapleton's opinions from fitness. I agree that everything that Dr. Stapleton had, Dr. Stapleton was entitled to have, except for the interview that she had with the defendant related to sanity, however short, long, insufficient it was in her opinion. I think that the best response that I can give to that is that the effect that that would have is that she's very clear in here that her observations and discussions with defendant during that sanity interview were utterly meaningless. So now we're saying, okay, that's her opinion, that's what she wrote, but if she had said the opposite, then what? If she had said, I did consider some of my observations, then you would concede that she couldn't testify? Well, no. What I think the problem is, is that because her further contact after the fitness evaluations, her further contact with the defense, in no way benefited her ultimate evaluation, which is actually specified pretty clearly when she was not able to form an opinion, until based on what she was provided by the defense at all. Okay, but isn't that something that is subject to debate? And are we going to let the witness, the psychiatrist, decide what influenced and didn't influence their opinion? Because she does indicate an opinion with regards to his claim of hallucinations. So with regard to that, she's speaking about malingering. And when she's talking about her diagnostic impressions, those are separate from her opinion as to whether he was insane at the time of the offense. Those two things are separate. And those things were determined by the fitness evaluation. And by the effect that a ruling that by putting up, is somebody asking? I hear a voice, but someone have a question? I don't know. It's none of us. We do hear something as well. We're having no, just so the record's clear, we are having absolutely no difficulty understanding anything you're saying. Okay, good. So the problem would be is that by doing two full evaluations, Stapleton was hired by the state and ordered under the court's order to do a fitness evaluation. Then by hiring Stapleton or reappointing Stapleton at the sanity stage, by her putting her foot in here, that would then, and it says very clearly in case law that once the privilege is waived, it's waived. So by then having a sanity evaluation later, the question would be, would that even under Knuckles, would that then now reapply a privilege to other information that had already been waived? There's no attorney-client privilege for the fitness evaluation.  There is an attorney-client privilege for a sanity evaluation. Correct. So by having a privilege over sanity doesn't then retroactively apply privilege to the fitness evaluations, which were already waived. And Knuckles doesn't indicate in any way that for the first time ever, privilege that didn't exist would be retroactively applied to information so that it can then be sealed up and not used by the state. So the defense, I'm sorry. Yeah. The defense hired, after they hired Dr. Argumento, but originally Stapleton was appointed by the court. The fitness proceedings was actually, Dr. Stapleton was the state's witness. I understand that. The defense hired Dr. Argumento. First utilized Stapleton for a sanity evaluation. Correct? I think Stapleton, I'm not sure which order it was in, I apologize. The state didn't ask Stapleton for a fitness evaluation, sorry, for a sanity evaluation first. It was the defense. I don't think that the state hired Dr. Stapleton. Yes, I think it was Stapleton and then they hired Argumento. And then the state went to Stapleton after the defense for sanity. No, Stapleton contacted the state because she had not received the information that she needed from the defense in order to complete her evaluation. And she states in the record, and I don't have the specific spot, in the record, it wasn't, Stapleton evaluated and was unable to reach a conclusion. She then contacted the state because she didn't have all of the evidence that was used, the videos, the evidence that was not given. And defense counsel acknowledged that after she had given nothing to Stapleton, in addition to what was in fitness, but the state did after the fact. When Dr. Stapleton reached out to the state because she didn't have the information that was necessary in order to form an opinion at all. Before the state elected to retain Stapleton for a sanity opinion, did Stapleton relay her inability to reach a decision one way or the other as it relates to sanity to the defense? I'm not sure if it's clear in the record what order that was in. I think that the information was made available at the same time. There was a hearing where counsel, I think it was February 1st or January 27th, when they had a hearing to discuss the situation with a continuance, which is actually discussed more in the first issue, which relates to how it came to be that they moved the trial date from February to May. And I think it was at that hearing where counsel first said, it may have been earlier than that, it may have been January 20th, that she indicated that there was no report. So I'm not sure in what form that information came to light, but it sounded to me from the record that it was disclosed in that January 27th hearing. But I would have to check to make sure that that date is right. But it was prior to, and it doesn't say specifically that this was because she was court appointed to do this initially. Court appointed to do a sanity evaluation on behalf of the defense. Yes. So when the defense raised, well, she raised the defense of sanity after Dr. Stapleton's report was not. We know that, but the point is the first time Stapleton was appointed to evaluate the defendant's sanity. Yes. Was by the court on behalf of the defense. Yes. Yes, I believe so. All right. But Dr. Stapleton's report is very clear that her contacts with the defense after the fact were not factored into her decision. And she's she plainly states that he no account of his functioning was was relayed in terms of that. It was in the days leading up to the offense that she was only able to rely on the videos and things that gave her the impression of his behavior in the days and time leading up to and around the defense and immediately after. Turning. Very briefly, I'll stand on my arguments as they relate to the difference between counsel requesting a third expert and requesting time to have the expert evaluate the defendant after the court denied. And as far as prejudice goes, I apologize. I see that I've run my time. The state would ask that you affirm the defendant's convictions unless your honors have any questions. I do not. Justice Albrecht or Justice. I do not. No, I have no questions. Thank you, Miss Bella. Mr. Golfers rebuttal. Thank you, Your Honor. Just to touch upon the points that were just raised. I think your honors view of the knuckles decision as conveyed to opposing counsel is correct. It doesn't leave room for parsing out. What's the defendant's insanity expert relied upon when reaching her conclusion as to Sandy? The rule is very simple. If the defense insanity expert had conversations with the defendant for purposes of the Sandy evaluation, those conversations are privileged. And unless one of those two exceptions articulated knuckles is present, that expert is off limits to the state, both in form of the expert's notes or report and any potential testimony at trial. I would note that counsel said that in knuckles, there wasn't a fitness evaluation done by Dr. That's incorrect. There was an interview done by Dr. Dr. During that interview. He just didn't prepare a report. And the issue in that case was access to the notes and testimony. And the court said that both the notes and the testimony were not going to be allowed to the state. And then just the final point that I would make just in terms of the timing. When the state requested disclosure of Dr. Stapleton's report on February 27th of 23, Dr. Stapleton already completed her Sandy evaluation of defendant, and she had already created a report. So it was known that she had reached the Sandy conclusion. And then your honor is correct that Dr. Stapleton was retained by the defense as a defense expert and not at the state's request. And Dr. Stapleton specifically testified to that during trial. And that's on page 1645 of the report proceedings. So that's all I have in rebuttal. And unless the court has any further questions for me, I think it for its time. And I ask that you reverse. Did I understand you to say? I just want to be sure. Are you saying that it was brought to the jury's attention that Dr. Stapleton was first hired by the defense? Yes. Thank you. And as Knuckles says, that can be very prejudicial. Yes. That is what Knuckles says, among other things. Thank you. Yeah. All right. Any questions from Justice Albrecht Peterson? No. I have none. All right. I didn't mean to interrupt you, Mr. Golfers. Were you finished? Yes, your honor. I was just going to repeat my request to release and ask that you reverse Mr. Watson's conviction and remand for further proceedings. And I thank the court for its time. Very well. We thank both sides for a spirited argument. We will take the matter under advisement and issue a decision in due course.